1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JERRY FUENTES,                               No.  2:11-cv-2225 JAM AC

12              Petitioner,

13        v.                                      FINDINGS AND RECOMMENDATIONS

14   F.X. CHAVEZ,

15              Respondent.

16

17        Petitioner is a California state prisoner proceeding with appointed counsel under 28

18   U.S.C. § 2254.  Petitioner was convicted of first degree murder by a Sacramento County jury in

19   2003, and sentenced to a term of imprisonment of 76 years to life.  His federal petition for writ of

20   habeas corpus was filed on August 23, 2011.  Respondent's answer was filed on October 10,

21   2012, and petitioner's traverse was filed on February 8, 2013.  For all the reasons that follow, the

22   undersigned recommends that the petition be denied.

23                             FACTUAL BACKGROUND

24        Petitioner was convicted of first degree murder in the death of his father's next door

25   neighbor, 85-year old Alfred Augusta.  The prosecution presented the following evidence at trial.

26        Petitioner had borrowed a wrench and socket from Augusta, saying that he needed them to

27   fix his father's car.  Petitioner and his father were not on speaking terms at the time.  A day or

28   two before the homicide, Augusta went to the home of the senior Mr. Fuentes to inquire about the

                                          1

1    status of the repairs.  Augusta was upset to learn that there was nothing wrong with the car.  He

2    told Fuentes to tell his son to return the tools.  Also a couple of days before his death, Augusta

3    mentioned to one of his daughters that he was mad at petitioner for not returning a tool.

4         On the afternoon before the homicide, petitioner's friend Jesse Luna saw petitioner

5    standing on the bottom step of Augusta's front porch.  Augusta was inside the open front door

6    yelling at petitioner.  Petitioner said something like, "I'll get them back to you, I'll go get them

7    right now."  That night petitioner went to his father's house, and his father told him to return

8    Augusta's tools.  Petitioner was upset by the request.

9         On the morning of the homicide, a neighbor saw petitioner walking from Augusta's house

10   toward his father's house.

11        That afternoon the Sheriff's Department received a report that a subject was down in the

12   back yard of Augusta's house.  Responding officers found Augusta lying on his back in the grass,

13   dead.  There was an indentation in the bloody grass near the victim's head, and blood stains on

14   the nearby concrete patio and planter pots.  There were no signs of a struggle inside the house,

15   nor any signs of forced entry.  A tool shed in the back yard was undisturbed.

16        The autopsy revealed that Augusta had been severely beaten, and was killed by blunt force

17   trauma to the head.  The victim had lacerations on the back of the head and behind his left ear,

18   caused by multiple blows.  He had major skull fractures,[1] bruises and lacerations to the face,

19   twelve freshly broken ribs, and a bruised and torn lung.  His spine was broken and partially

20   separated at chest level.  The spinal injury was consistent with being kicked or stomped.  There

21   were no signs of defensive wounds.  A cement block or pillar that was found in the patio area had

22   strands of hair on it, and was collected as evidence.

23        The police questioned defendant several times, and videotapes of the interviews were

24   played for the jury.  Petitioner's story changed repeatedly in response to questioning, and

25   petitioner repeatedly lied.  In early questioning he claimed to have been at work all day, and then

26   claimed to have seen a suspicious stranger at Augusta's house a few days earlier.  He first denied

27

28

---

[1] A web of fracture lines spanned the entire circumference of Augusta's skull.

2

1   having been at Augusta's house at all on the day of the homicide, then claimed that he had gone

2   to see Augusta about the tools and left him alive and well.  Eventually petitioner reported that he

3   and Augusta had argued about the tools, a scuffle ensued, and Augusta fell and hit his head.  The

4   details of petitioner's story changed repeatedly as officers told him what they had learned from

5   the coroner about Augusta's injuries.  Eventually petitioner admitted to hitting Augusta on the

6   head with a concrete foundation pier.  Petitioner told police the pier weighed 40 or 50 pounds.

7   Petitioner acknowledged that Augusta was lying on the ground when he hit him in the head with

8   the pier.

9          Later that night, petitioner accompanied officers to the scene and re-enacted the incident.

10  The re-enactment was videotaped, and played for the jury.  Petitioner said that after hitting

11  Augusta with the pier, he washed the blood off the pier and put it back where he had found it.  He

12  said that he did not mean to kill August, but only to knock him out.  Petitioner acknowledged

13  hitting Augusta with the pier twice.  Both times he threw the pier at Augusta's head while

14  Augusta lay on the ground.  In another interview two days later, petitioner denied hitting or

15  kicking Augusta.  He said the victim's broken ribs might have been caused by the pier being

16  thrown at his head and also hitting his body.

17         The defense presented no witnesses, but contested premeditation and deliberation.

18  Counsel argued for a manslaughter verdict on grounds that the killing had resulted from an

19  argument that escalated into a fight, in which any intent to kill was formed spontaneously in

20  response to provocation.  Counsel relied on petitioner's statements to police that during their

21  argument Augusta had grabbed him and said, "Fuck you, Jerry, I hate you.  You fucking

22  Mexicans are all alike."  The defense argued that petitioner had reacted in sudden rage but

23  without deliberation to this verbal abuse.

24         The jury found petitioner guilty of first degree murder and found a deadly weapon

25  enhancement true.

26  ////

27  ////

28  ////

3

PROCEDURAL HISTORY

I.      State Court Proceedings

Judgment was entered on October 21, 2003.  Petitioner was sentenced to seventy-six years to life in prison.  The court of appeal affirmed the judgment on November 10, 2004.  The California Supreme Court denied review on February 16, 2005.

Petitioner filed a petition for writ of habeas corpus in the California Supreme Court on May 22, 2007.  This petition included a bare-bones claim of ineffective assistance of counsel for failing to investigate mental health issues.  The petition was denied on October 10, 2007.

Petitioner filed a petition for writ of habeas corpus in Sacramento County Superior Court on June 17, 2008.  This petition included a claim of ineffective assistance of counsel for failing to investigate mental health defenses, supported by exhibits including a 2003 Report of Neuropsychological Testing and Evaluation by John Wicks, Ph.D.  After issuing an Order to Show Cause on two issues (timeliness and the ineffective assistance claims) and appointing counsel, the court ultimately denied the petition as successive and untimely on July 22, 2009.

Petitioner submitted the same ineffective assistance claim to the California Court of Appeal on October 29, 2009, and that petition was denied on November 19, 2009.  Petitioner submitted a petition containing the same claim to the California Supreme Court on February 8, 2011.  This petition also presented a claim that petitioner was actually innocent of first degree murder.  The state's highest court denied the petition on August 12, 2011, with citation to In re Robbins, 18 Cal. 4th 770, 780 (1998) and In re Clark, 5 Cal. 4th 750, 767-69 (1993).

II.     Federal Court Proceedings

Petitioner filed his federal habeas petition in pro per on August 23, 2011.  On December 1, 2011, respondent moved to dismiss the petition as untimely.  After petitioner sought an extension of time to oppose the motion, referencing his borderline mental retardation, the magistrate judge appointed counsel.  Counsel subsequently opposed the motion to dismiss and sought equitable tolling based on petitioner's cognitive impairments and mental health issues, as well as on grounds of physical illness and denial of access to legal materials.  Petitioner sought discovery and an evidentiary hearing related to equitable tolling.  The magistrate judge granted the request

4

1   for discovery, and vacated the motion to dismiss subject to re-noticing upon conclusion of

2   discovery.

3       On October 4, 2012, respondent filed an answer.[2]  The answer asserted the statute of

4   limitations and procedural default doctrine as affirmative defenses, and also answered on the

5   merits.  Petitioner's traverse was filed on February 8, 2013.

6       At no time following the appointment of counsel did petitioner seek to amend the petition

7   or to expand the record with any additional evidence.

8                               PROCEDURAL DEFENSES

9       Although respondent has asserted both untimeliness and procedural default, he expressly

10  invites the court to bypass the procedural defenses and reach the merits.  Petitioner joins the

11  request to bypass procedural default, and reasserts his entitlement to equitable tolling of the

12  statute of limitations on the basis of the previous briefing.  Because the undersigned agrees that it

13  is appropriate to proceed to the merits, only a brief discussion of the procedural defenses is

14  necessary here.

15      I.      Statute of Limitations

16      A one-year statute of limitations applies to federal petitions for writ of habeas corpus.  28

17  U.S.C. § 2244(d).  Absent circumstances not present here, the limitations period runs from the

18  date that the state court judgment becomes final by the conclusion of direct review or the

19  expiration of time to seek direct review.  § 2244(d)(1)(A); Porter v. Ollison, 620 F.3d 952, 958

20  (9th Cir. 2010).  The time during which a "properly filed" application for state post-conviction

21  relief is pending does not count toward this one-year period.  § 2244(d)(2); Porter, 620 F.3d at

22  958.  However, a petition filed after the expiration of the statute of limitations has no effect on the

23  timeliness analysis.  Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir.), cert. denied, 540 U.S.

24  924 (2003) (state petition filed after expiration of § 2244 period cannot resuscitate expired

25  period).

26      Petitioner's conviction became final on May 17, 2005, when the time expired to seek

27  _____

28  [2] The motion to dismiss was not re-noticed.

5

1    certiorari in the United States Supreme Court after the California Supreme Court denied review

2    on direct appeal.  See Gonzalez v. Thaler, 132 S. Ct. 641, 653-54 (2012); Bowen v. Roe, 188 F.3d

3    1157, 1159 (9th Cir. 1999) (limitations period begins to run 90 days after the state supreme

4    court's denial, when the time to seek certiorari expires).   Petitioner filed no applications for state

5    habeas relief during the year following finality, so the limitations period elapsed without any

6    tolling on May 17, 2006.   The federal petition, filed over 5 years late, is therefore time-barred

7    absent equitable tolling.

8          A habeas petitioner is entitled to equitable tolling of AEDPA's one-year statute of

9    limitations only if the petitioner shows: (1) that he has been pursuing his rights diligently; and (2)

10   that some extraordinary circumstances stood in his way and prevented timely filing.  See Holland

11   v. Florida, 130 S. Ct. 2549, 2562 (2010); Ramirez v. Yates, 571 F.3d 993, 997 (9th Cir. 2009).

12   The diligence required is "reasonable diligence," not "maximum feasible diligence."  See

13   Holland, 130 S.Ct. at 2565; see also Bills v. Clark, 628 F.3d 1092, 1096 (9th Cir. 2010).

14         In order to constitute "extraordinary circumstances," the circumstances alleged in support

15   of tolling must make it impossible to file a petition on time, and must be the cause of the

16   petitioner's untimeliness.  Spitsyn v. Moore, 345 F.3d 796, 799 (9th Cir. 2003).  This is a very

17   high threshold, "lest the exceptions swallow the rule."  See Miranda v. Castro, 292 F.3d 1063,

18   1066 (9th Cir.), cert. denied, 537 U.S. 1003 (2002).  Mental incompetence or mental illness can

19   constitute an extraordinary circumstance supporting equitable tolling.  Laws v. Lamarque, 351

20   F.3d 919, 923 (9th Cir. 2003); Bills, 628 F.3d at 1097.  A petitioner seeking tolling for mental

21   impairment must satisfy a two-part test:

22          (1) First, a petitioner must show his mental impairment was an
             "extraordinary circumstance" beyond his control . . . by
23          demonstrating the impairment was so severe that either

24          (a) petitioner was unable rationally or factually to personally
             understand the need to timely file, or
25
            (b) petitioner's mental state rendered him unable personally to
26          prepare a habeas petition and effectuate its filing.

27          (2) Second, the petitioner must show diligence in pursuing the
             claims to the extent he could understand them, but that the mental
28          impairment made it impossible to meet the filing deadline under the

                                        6

1
2

> totality of the circumstances, including reasonably available access
> to assistance. . . .

3   <u>Bills</u>, 628 F.3d at 1099-1100.

4         In the case before the court, petitioner seeks equitable tolling on grounds of mental

5   impairment, physical illness, and impaired access to his legal materials.  He has submitted

6   supporting evidence including but not limited to the declarations of petitioner, his appellate

7   counsel and his present habeas counsel; the 2003 neuropsychological report that is the basis of his

8   substantive claims, which identifies numerous cognitive impairments; documents showing that

9   petitioner read at a fourth-to-sixth grade level from 2006 through 2010; and three pages of

10  medical records that document prison psychiatric services provided to petitioner in 2004 and

11  2005, which are offered as examples.

12        If it is necessary to decide the equitable tolling issue presented in this case, an evidentiary

13  hearing will be required.  <u>See</u> <u>Roy v. Lampert</u>, 455 F.3d 945, 950 (9th Cir. 2006) (evidentiary

14  hearing required when petitioner makes good faith allegation that would, if true, entitle him to

15  equitable tolling), <u>cert. denied</u>, 549 U.S. 1317 (2007); <u>Bills</u>, 628 F.3d at 1101 (non-frivolous

16  showing of a severe mental impairment during the limitations period requires a hearing).

17  However, if petitioner's claims must be denied regardless of their timeliness, this court need not

18  reach the statute of limitations defense.  Because the undersigned concludes for the reasons

19  explained below that petitioner is not entitled to relief on the merits, fact-finding related to

20  equitable tolling is not necessary.  <u>See</u> <u>Ramos-Martinez v. United States</u>, 638 F.3d 315, 324 (1st

21  Cir. 2011) (approving district court's decision to bypass equitable tolling issue and proceed to

22  merits of claims in § 2255 case).

23        II.    <u>Procedural Default</u>

24        The procedural default doctrine bars consideration in federal habeas of claims that were

25  rejected by a state court on the basis of a state procedural rule that is independent of the federal

26  question and adequate to support the judgment.  <u>Walker v. Martin</u>, 131 S.Ct. 1120, 1127 (2011).

27  In <u>Walker</u>, the Supreme Court held that California's timeliness bar constitutes an independent and

28  adequate state law ground that supports default.  <u>Id.</u> at 1128-29.  Because petitioner's 2011

1   petition in the California Supreme Court was denied with citation to In re Robbins, 19 Cal. 4th

2   770 (1998) and In re Clark, 5 Cal. 4th 767-769 (1993), that denial was based on a finding of

3   untimeliness and not on the merits.  Id. at 1128.

4          Notwithstanding the holding in Walker, California petitioners continue to dispute the

5   adequacy of the state's untimeliness bar on theories not considered by the Supreme Court.

6   Determinations of adequacy can be complicated and time-consuming.  See Bennett v. Mueller,

7   322 F.3d 573 (9th Cir.) (establishing burden-shifting framework and treating adequacy as an

8   empirical question) , cert. denied, 540 U.S. 938 (2003).  Even where a state procedural bar is

9   adequate to support default, a petitioner can overcome default by demonstrating cause and

10  prejudice.  Coleman v. Thompson, 501 U.S. 722, 753 (1991).  The cause and prejudice inquiry

11  overlaps with the merits of petitioner's claims, because a petitioner must show that a meritorious

12  claim was forfeited in order to demonstrate actual prejudice.  See Murray v. Carrier, 477 U.S.

13  478, 494 (1986); Correll v. Stewart 137 F.3d 1401, 1415-16 (9th Cir.), cert. denied, 525 U.S. 996

14  (1998).

15         A procedural default may also be overcome with proof of actual innocence.  Schlup v.

16  Delo, 513 U.S. 298 (1995); House v. Bell, 547 U.S. 518 (2006).  Plaintiff here has presented a

17  freestanding claim of actual innocence as grounds for relief.  In this context as well, the analysis

18  related to default overlaps with (if it is not identical to) review of the merits.

19         Respondent invites the court to bypass procedural default in this case and proceed to the

20  merits of petitioner's claims.  Answer, ECF No. 29 at 15, 16.  Petitioner concurs, requesting an

21  opportunity for further briefing should the court choose to address procedural default.  Traverse,

22  ECF No. 40 at 7.  In light of the potential complexity of the procedural default issue and the

23  overlap of cause and prejudice analysis with the merits, the undersigned agrees that direct

24  consideration of the merits is appropriate.  See Lambrix v. Singletary, 520 U.S. 518, 522−25

25  (holding that a federal court need not invariably resolve a state procedural bar issue first where it

26  presents complicated issues of state law and the other issue is easily resolvable against the

27  petitioner); Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (proper to proceed to merits

28  where procedural bar issue more complicated and result the same).  Like equitable tolling, this

1    defense need only be adjudicated if petitioner would be entitled to relief on the merits of his

2    claims absent a bar to such relief.  For the reasons now explained, petitioner's claims fail whether

3    or not they are timely and/or defaulted.

4                                            MERITS

5        I.        Ineffective Assistance For Failure To Present Mental Health Defense

6                 A.   Petitioner's Allegations

7          The petition alleges that trial counsel rendered ineffective assistance by failing to present a

8    mental health defense based on the pretrial report of neuropsychologist John Wicks, Ph.D.

9    Because the petition was filed in pro se prior to the appointment of counsel, the court construes

10   the allegations liberally, see Ferdik v. Bonzelet, 963 F.2d 1258, 1261 (9th Cir.1992), as follows.[3]

11         Prior to trial, Dr. Wicks conducted a comprehensive neuropsychological evaluation of

12   petitioner at the request of defense counsel.  Dr. Wicks found that petitioner was borderline

13   mentally retarded and cognitively impaired in numerous ways.  The report identified sources of

14   neurological damage including a history of substance abuse, and suggested that petitioner's

15   impaired executive functioning and impulsivity had an organic basis.

16         Fourteen years prior to the Wicks report, in 1989, petitioner had been evaluated by Shawn

17   Johnston, Ph.D. in relation to his suitability for CYA placement.  Dr. Johnston found indications

18   that petitioner suffered from a psycho-neurological deficit, and concluded that he was not

19   "capable of fully mobilizing either his intellectual or emotional resources in effective problem-

20   solving."  Dr. Johnston's testing strongly suggested a diagnosis of Borderline Personality

21   Disorder with narcissistic and antisocial features.

22         In 1990 petitioner was transferred from CYA to the California Medical Facility, where he

23   was placed in the Department of Mental Health program.  In 2000, presumably after his release

24   from his first prison term and before the homicide that led to his present sentence, petitioner was

25   involved in a car accident in which he sustained a head injury.[4]

26   ───────────────

[3] As previously noted, following appointment of counsel petitioner did not seek to amend the
27   petition or to expand the record with additional evidence.

[4] The petition was supported by the reports of Drs. Wicks and Johnston, correctional mental
28   (continued…)

1    Despite this evidence of brain injury and impaired mental functioning, trial counsel did

2    not pursue a mental state defense.  Petitioner's mental impairments would have provided a

3    defense to first degree murder.

4          B.  Standard of Review

5    Respondent assumes that petitioner's ineffective assistance of counsel claim is subject to

6    the constraints on habeas relief imposed by 28 U.S.C. § 2254, as amended by the Antiterrorism

7    and Effective Death Penalty Act of 1996 ("AEDPA").  See, generally, Williams v. Taylor, 529

8    U.S. 362, 412 (2000).  That statute provides that claims previously adjudicated on the merits by a

9    state court can only support federal habeas relief if the state court judgment was objectively

10   unreasonable in its application of federal law or its determination of facts.  28 U.S.C. § 2254(d).

11   These standards apply whether or not the state court explained the basis for its decision.

12   Harrington v. Richter, 131 S. Ct. 770, 785 (2011).  AEDPA standards do not apply if the state

13   court judgment rested exclusively on procedural grounds, however, because such a judgment does

14   not adjudicate the merits.  See Cone v. Bell, 556 U.S. 449, 472 (2009) ("Because the Tennessee

15   courts did not reach the merits of Cone's Brady claim, federal habeas review is not subject to the

16   deferential standard that applies under AEDPA . . .  Instead, the claim is reviewed de novo.");

17   Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002) (where state supreme court rejected claim

18   on procedural grounds, there is no merits adjudication entitled to AEDPA deference and district

19   court reviews constitutional issue de novo), cert. denied, 539 U.S. 916 (2003).

20   Petitioner argues that the claim's merits should be reviewed de novo in this court, because

21   the claim at issue was rejected by the California Supreme Court in 2011 on timeliness grounds.

22   The court agrees.  In Pirtle, the Ninth Circuit held that a claim rejected on procedural grounds in

23   state court was subject to de novo merits review in federal habeas.  When the federal court

24   proceeds to the merits despite assertion of a procedural bar – either because the default doctrine is

25   held not to bar merits review, as in Pirtle, or because the default issue is bypassed, as here -- §

26   _____

27   health records from petitioner's previous period of incarceration, medical records documenting
     the 2000 car crash and head injury, and documents regarding his mental health classification and
28   treatment in prison following the conviction at issue in this case.

1  2254(d) does not apply.  Pirtle, 313 F.3d at 1167, 1168.

2          A bare-bones ineffective assistance claim had previously been presented in petitioner's

3  2007 petition to the California Supreme Court.[5]  That petition was denied on the merits without

4  discussion, and the claim it presented would therefore be subject to review under § 2254.  See

5  Harrington, 131 S. Ct. at 785.  As petitioner notes, however, the 2007 claim did not mention and

6  was not supported by Dr. Wicks' report, which is the centerpiece of the federal claim.

7  Accordingly, the claim denied on the merits in 2007 is not in any meaningful sense the same

8  claim that was denied on procedural grounds in 2011 and presented here.  Respondent's

9  substantive discussion of Dr. Wick's report indicates his agreement that the claim subject to

10  review here is the expanded claim that was exhausted in 2011 and is described above.

11          In any event, this is not a case in which the outcome is determined by the standard of

12  review.  For the reasons explained below, the claim fails even under the more lenient de novo

13  standard.  See Berghuis v. Thompkins, 130 S.Ct. 2250, 2264 (2010) (where claim fails under de

14  novo standard of review, it would also fail under AEDPA's heightened standard of deference to

15  state court judgments).

16                  C.  Law Governing Ineffective Assistance of Counsel

17          To establish a constitutional violation based on ineffective assistance of counsel, a

18  petitioner must show (1) that counsel's representation fell below an objective standard of

19  reasonableness, and (2) that counsel's deficient performance prejudiced the defense.  Strickland v.

20  Washington, 466 U.S. 668, 692, 694 (1984).  In evaluating counsel's performance, the court

21  applies a strong presumption that counsel's representation fell within the wide range of

22  reasonable professional assistance.  Strickland, 466 U.S. at 689.  Counsel's strategic choices are

23  generally accorded deference, but only if those decisions are reasonable and are based on

24

25  [5] The 2007 petition alleged in general terms that ". . . Petitioner was denied effective assistance of
    counsel at trial and on direct appeal because the Petitioner's mental health history was never
26  explored nor was it mentioned or raised at trial . . ."  Lodg. Doc. 5, Appendix to Petition at 9.
    This petition contained no specific facts regarding petitioner's mental health history or its
27  possible significance to the defense, and was not supported by any mental health information that
    was extant at the time of trial.

28

1    reasonable investigations, research, and judgments.  Id. at 690-91; see also, Jones v. Wood, 114

2    F.3d 1002, 1010 (9th Cir. 1997) (strategic choices are not immune from challenge -- they must be

3    reasonable); Jennings v. Woodford, 290 F.3d 1006, 1014 (9th Cir. 2002) (to be reasonable,

4    tactical choices require sufficient evidentiary basis).

5            Prejudice means that the error actually had an adverse effect on the defense.  There must

6    be a reasonable probability that, but for counsel's errors, the result of the proceeding would have

7    been different.  Id. at 693–94.  A reasonable probability is a probability sufficient to undermine

8    confidence in the outcome.  Id.  A reviewing court need not address both prongs of the Strickland

9    test if the petitioner's showing is insufficient as to one prong.  Strickland, 466 U.S. 668 at 697.

10   "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice,

11   which we expect will often be so, that course should be followed."  Id. at 689.

12           D.  Analysis

13           There is no doubt that a criminal defense lawyer with a cognitively impaired or mentally

14   ill client has a duty to investigate the possible legal implications of the defendant's mental

15   defects, including potential mental state defenses.  See Jennings, 290 F.3d at 1016; Seidel v.

16   Merkle, 146 F.3d 750, 755-56 (9th Cir. 1998).   In this case, the petition and its exhibits easily

17   support the preliminary proposition that reasonably diligent counsel should have investigated

18   whether or not petitioner's mental impairments provided a defense to first degree murder by

19   raising a reasonable doubt about premeditation and deliberation.  However, nothing in the petition

20   or supporting evidentiary record provides a basis for determining whether or not trial counsel's

21   failure to present a mental health defense was a legitimate strategic decision based on reasonable

22   investigation.[6]  See Strickland, 466 U.S. at 690-91.  And even if petitioner could establish

23   unreasonable performance, the claim would fail because there has been an insufficient showing of

24   prejudice.  See id. at 689.

25           Petitioner relies on the Wicks report, which cannot support a finding of prejudice because

26   ─────────────────────
27   [6] See James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations [of ineffective
     assistance] which are unsupported by a statement of specific facts do not warrant habeas relief.")
     (citing Boehme v. Maxwell, 423 F.2d 1056, 1058 (9th Cir. 1970)).

28

1   it simply did not address whether or how petitioner's identified impairments may have affected

2   criminal intent.  In his traverse, petitioner argues strenuously that Dr. Wicks' report "negated"

3   premeditation and deliberation.[7]  Dr. Wicks never mentioned the words premeditation or

4   deliberation, however.  He did not address petitioner's mental state at the time of the crime, did

5   not evaluate the impact of the impairments he identified on the cognitive processes involved in

6   premeditation or deliberation, and offered no opinion whatsoever about mental state defenses.

7   Counsel retained Dr. Wicks for a "comprehensive neuropsychological evaluation," presumably as

8   a preliminary screening tool, but the report did not indicate any questions of reference related to

9   the existence of defenses to first degree murder -- or any other specific legal issue, such as

10   competency.  Accordingly, the report would be relevant to the performance prong of Strickland as

11   evidence that counsel was on notice of a potential defense, see Seidel, 146 F.3d at 755, but it falls

12   far short of establishing prejudice from the failure to develop and present a mental health defense.

13       Dr. Wicks found in relevant part as follows, on the basis of behavioral observations and a

14   comprehensive battery of neuropsychological tests:  Petitioner's IQ scores placed him in the

15   borderline retarded range.  He demonstrated no signs of psychosis.  He was significantly impaired

16   in memory and other cognitive functions directly related to learning.  Test scores reflected

17   attentional problems related to ADHD, and a pattern of impulsivity.  Overall cognitive

18   functioning was rated as mildly to moderately impaired.  Cognitive flexibility and executive

19   functioning were impaired.   Dr. Wicks ruled out malingering.  He concluded that petitioner

20   functioned overall at a borderline retarded level, almost certainly had ADHD during his school-

21   age years, and may have suffered further organic brain damage as the result of substance abuse

22   and his 2000 head injury.  Petitioner's executive functioning impairments "indicate problems with

23   such higher level functions as abstract thinking, impulse control, and judgment."  Dr. Wicks

24   noted in conclusion, "These individuals [with impaired executive functioning] tend to be highly

25   impulsive, self-destructive, and generally demonstrate poor social judgment.  Substance abuse, of

26

27   [7] This argument is made in relation to petitioner's actual innocence claim, which the parties
     discuss first.  The argument is equally applicable to the merits of the Strickland claim.

28

13

1  course, exaggerates these problems considerably."  Wicks Report, ECF No. 1 at 21-81.

2      Petitioner was charged with first degree murder, which required proof beyond a

3  reasonable doubt that the killing was "willful, deliberate, and premeditated."  Cal. Pen. Code §

4  189.  The jury was instructed in relevant part as follows:

5          The word "willful". . . means intentional.  The word "deliberate"
           means formed or arrived at or determined upon as the result of
6          careful thought and weighing of considerations for an against the
           proposed course of action.   The word "premeditated" means
7          considered beforehand. . . .

8          The law does not undertake to measure in units of time the length of
           the period during which the thought must be pondered before it can
9          ripen into an intent to kill which is truly deliberate and
           premeditated. . . .   The true test is not the duration of time, but
10         rather the extent of the reflection.  A cold, calculated judgment and
           decision may be arrived at in a short period of time, but a mere
11         unconsidered and rash impulse, even though it includes an intent to
           kill, is not deliberation and premeditation as will fix an unlawful
12         killing as murder in the first degree. . . .

13  RT 371-72; CT 111.

14     At the time of petitioner's trial, the defense of diminished capacity – the *inability* to form

15  the required intent – had long been abolished.  See People v. Castillo, 16 Cal. 4th 1009, 1013-14

16  (1997).  Petitioner retained the ability to present mental health evidence, including expert witness

17  testimony, raising a doubt about whether he *actually* lacked the required state of mind.  See

18  People v. Steele, 27 Cal. 4th 1230, 1253 (2002).  To defeat a first degree murder verdict on this

19  theory, counsel needed to present evidence that petitioner, due to the impairments identified by

20  Dr. Wicks, did not in fact form a deliberate and premeditated intent to kill Alfred Augusta.

21     Petitioner has neither presented nor proffered any expert opinion that addresses

22  petitioner's state of mind at the time of the homicide.  The Wicks report identifies impairments

23  that raise *questions* about intent, but it does not answer or even address those questions.  At most,

24  the Wicks report should have indicated to counsel that a more specific follow-up investigation

25  into the viability of mental health defenses was warranted.  Without a showing of the evidence

26  that could have been developed by such an investigation, however, petitioner cannot establish

27  prejudice under Strickland.  See, e.g., Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997)

28  ("Speculation about what an expert could have said is not enough to establish prejudice.");

14

1    <u>Hendricks v. Calderon</u>, 70 F.3d 1032, 1042 (1995) ("Absent an account of what beneficial

2    evidence investigation into any of these issues would have turned up, [petitioner] cannot meet the

3    prejudice prong of the <u>Strickland</u> test."), <u>cert. denied</u>, 517 U.S. 1111 (1996).

4          Petitioner argues in essence that the deficits identified by Dr. Wicks are so inherently

5    incompatible with premeditation and deliberation that the Wicks report, without more, creates the

6    reasonable probability of a different trial outcome.  The court is unpersuaded, for several reasons.

7    First, the report does not indicate that Dr. Wicks (or any other expert) would have testified that

8    petitioner's deficits are inherently incompatible with premeditation or deliberation.  Second, any

9    such general testimony regarding petitioner's incapacity to form the requisite intent would have

10    been inadmissible.  <u>See</u> <u>Castillo</u>, <u>supra</u>.  Third, a jury aware of Dr. Wicks' findings would not

11    have been likely to reach a different result.  Reasonable jurors are not likely to have concluded

12    that petitioner's low intelligence negated premeditation and deliberation, neither of which require

13    intellectual sophistication.  And although people with impaired executive functioning may, as a

14    class, be more likely than other people to act impulsively, that does not mean that petitioner's

15    particular act of repeatedly throwing a cement block at Augusta's head was not deliberately

16    intended to kill.  Given the circumstances of the crime, a jury could reasonably have concluded

17    that petitioner despite his learning disabilities formed the required mental state in the course of

18    the confrontation with Augusta.  <u>See</u> <u>People v. Mayfield</u>, 14 Cal. 4th 668, 767 (1997) (the process

19    of premeditation and deliberation can occur quickly); <u>People v. Bolin</u>, 18 Cal. 4th 297, 332

20    (1998) ("Thoughts may follow each other with great rapidity and cold, calculated judgment may

21    be arrived at quickly. . . .").

22          To be sure, there was no evidence in this case that petitioner went to Augusta's house on

23    the day of the homicide having planned to hurt him.  As defense counsel argued, the murder

24    weapon was an object grabbed at the scene, likely in the midst of a confrontation.  This fact, and

25    petitioner's statement that Augusta had used hateful and racist language, could together have

26    supported a jury's conclusion that petitioner simply "snapped."  Defense counsel made this

27    argument.  Although the Wicks report suggests the possibility that mental health evidence

28    consistent with the defense theory could have been developed, the report by itself does not make

15

1    that theory significantly stronger.  The jury rejected the "rash impulse" defense,[8] perhaps because

2    petitioner's many and repeated lies to the police about what had happened undercut the credibility

3    of his statement regarding the racist provocation.  In any event, the generalized findings of the

4    Wicks report do not create the reasonable probability of a different outcome that Strickland

5    requires.

6         Because petitioner's ineffective assistance claims fails under the de novo standard of

7    review, it would also fail under AEDPA's heightened standard.  See Berghuis, 130 S.Ct. at 2264.

8         II.     Actual Innocence

9            A.  Petitioner's Allegations

10        Again relying on the Wicks report, petitioner alleges that he is actually innocent of first

11   degree murder because he did not deliberate or premeditate.

12           B.  Standard of Review

13        Plaintiff's claim of actual innocence was denied by the California Supreme Court as

14   untimely, not on the merits.  Lodg. Doc. 12.  Because the claim was not adjudicated on the merits

15   in state court, the high hurdle of 28 U.S.C. § 2254(d) need not be satisfied.  Respondent appears

16   to seek application of AEDPA standards to the claim.  See ECF No. 29 at 7-11(setting forth

17   AEDPA standards as governing the case), 16 (arguing that state court denial of Claim One was

18   reasonable).  Respondent does not explain, however, why these standards would apply to a claim

19   that he contents is defaulted.  It is well established that a constitutional claim rejected by a state

20   court on procedural grounds is subject to de novo merits review in federal habeas.  See Cone, 556

21   U.S. at 472 ("Because the Tennessee courts did not reach the merits of Cone's Brady claim,

22   federal habeas review is not subject to the deferential standard that applies under AEDPA . . .

23   Instead, the claim is reviewed de novo."); Pirtle, 313 F.3d at 1167 (where state supreme court

24   rejected claim on procedural grounds, there is no merits adjudication entitled to AEDPA

25   deference and district court reviews constitutional issue de novo).

26   _____

27   [8] "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting
     thought and reflection rather than unconsidered or rash impulse."  People v. Stitely, 35 Cal. 4th
     514, 543 (2005).

28

1

    C.  Governing Legal Principles

2

       The Supreme Court has articulated the standards for an actual innocence showing that will

3

permit merits review of otherwise defaulted or time-barred claims.  Shlup v. Delo, 513 U.S. 298

4

(1995) (defining actual innocence exception to procedural default doctrine); McQuiggin v.

5

Perkins, 133 S.Ct. 1924 (2013) (recognizing actual innocence exception to statute of limitations).

6

The high court has never held that a free-standing claim of actual innocence, untethered to the

7

violation of an independent constitutional right, will support habeas relief.  See Herrera v.

8

Collins, 506 U.S. 390, 417 (1993) (assuming without deciding that the execution of an innocent

9

person would violate the constitution).[9]  Assuming for present purposes that the conviction of an

10

innocent person in a non-capital case is unconstitutional and therefore provides grounds for relief,

11

petitioner would have to affirmatively demonstrate that he is actually innocent.  Carriger v.

12

Stewart, 132 F.3d 463, 477 (9th Cir. 1997) (en banc).  To satisfy this requirement, he must

13

present evidence in light of which "it is more likely than not that no reasonable juror would have

14

convicted him."  Schlup, 513 U.S. at 327.

15

    D.  Analysis

16

       Respondent argues that petitioner does not really claim innocence, but merely contends

17

that California is legally barred from punishing him.  Answer, ECF No. 29 at 16.  Respondent

18

misapprehends both petitioner's theory and the law.  Because the mental state of premeditation

19

and deliberation is an essential element of first degree murder, affirmative evidence that petitioner

20

did not premeditate and deliberate would indeed render him innocent of first degree murder (but

21

would not preclude liability for a lesser degree of homicide).  See Jackson v. Virginia, 443 U.S.

22

307, 316 (1979) (In re Winship, 397 U.S. 358 (1970), requires proof of every element beyond a

23

reasonable doubt; see also Sandstrom v. Montana, 442 U.S. 510, 520-21 (1979) (applying

24

Winship to intent element of deliberate homicide).

25

26

[9] The Herrera Court was dubious that such a freestanding right exists.  Herrera, 506 U.S. at 400-405.  Were this claim subject to review under § 2254(d), it would fail because no "clearly established Federal law" provides for relief.  See Alberni v. McDaniel, 458 F.3d 860, 867 (9th

27

Cir. 2006) (habeas petition must be denied where U.S. Supreme Court has not explicitly recognized the constitutional right asserted), cert. denied, 549 U.S. 1287 (2007).

28

1    In any case, petitioner's innocence claim fails because he has not established that no

2    reasonably juror would find premeditation and deliberation in light of the Wicks report.  See

3    Schlup, 513 U.S. at 327.  For the same reasons that petitioner's evidence does not support a

4    finding of prejudice under Strickland, it does not satisfy the even more demanding standard of

5    Schlup.

6        Even an expert report that affirmatively provides an alternative explanation for a homicide

7    is insufficient to establish actual innocence of first degree murder.  See Boyd v. Brown, 404 F.3d

8    1159, 1168 (9th Cir. 2005).  The Ninth Circuit in Boyd rejected an actual innocence claim

9    predicated on an expert affidavit that, unlike petitioner's here, directly disputed premeditation on

10   psychiatric grounds.  The court restated its rule that "the mere presentation of new psychological

11   evaluations [not presented at trial] does not constitute a colorable showing of actual innocence."

12   Id. (quoting Harris v. Vasquez, 949 F.2d 1497, 1515 (9th Cir. 1990)).  In Griffin v. Johnson, 350

13   F.3d 956 (9th Cir. 2003), cert. denied, 541 U.S. 998 (2004), the court rejected an actual innocence

14   claim that was based on a showing of low intelligence, organic brain dysfunction that impaired

15   planning and initiation capabilities, and an expert opinion that in light of these deficits the

16   petitioner may not have been able to form the requisite intent.  The court noted that petitioner's

17   diagnosed impairments did not preclude specific intent, and that post hoc expert evaluations are

18   inadequate to establish actual innocence.  Griffin, 350 F.3d at 965.

19       Petitioner's showing is plainly insufficient under Boyd and Griffin.  While a mental health

20   defense may or may not have worked at trial, the Wicks report cannot under Circuit precedent

21   support habeas relief on actual innocence grounds.

22                          REQUEST FOR EVIDENTIARY HEARING

23       The Traverse includes a request for an evidentiary hearing "to flesh out the mental health

24   issues."  ECF No. 40 at 17.  Because the allegations of the petition and its supporting exhibits are

25   insufficient to support relief, there is no basis for an evidentiary hearing.  Even under pre-AEDPA

26   standards, evidentiary hearings are appropriate only where the petitioner's allegations, if true,

27   would entitle him to relief.  Earp v. Ornoski, 431 F.3d 1158, 1170 (9th Cir. 2005), cert. denied,

28   547 U.S. 1159 (2006).

                                                  18

1    Petitioner's allegations of deficient performance by trial counsel are largely conclusory,

2    and unsupported by declarations or other evidence regarding pretrial investigation and

3    preparation.  Petitioner establishes that counsel knew his client had cognitive deficits, and the

4    state court record reflects that no mental state evidence was presented at trial.  The petition is

5    entirely silent, however, as to what counsel did and did not do after receiving the Wicks report

6    and before trial.  General allegations that counsel failed to investigate a potential defense,

7    unsupported by a statement of specific facts, are insufficient.  See James, 24 F.3d at 26.

8    As discussed at some length above, petitioner also has not pled facts sufficient to support

9    prejudice.  Specifically, neither the petition nor its attachments – including the Wicks report –

10   specify what expert opinion could have been presented at trial regarding premeditation and

11   deliberation.  See Grisby, 130 F.3d at 373.  The Wicks report suggests an investigative direction,

12   but does not establish where investigation would have led.  See Hendricks, 70 F.3d at 1042.

13   Accordingly, even if petitioner were to prove that counsel unreasonably failed to investigate

14   mental health defenses, he could not prevail under Strickland.

15   An evidentiary hearing is not a tool for petitioners to discover their cases, is an

16   opportunity for a properly pleaded case to be proved.  Because the claims here are inadequate to

17   support relief, an evidentiary hearing is not necessary.

18                                                    CONCLUSION

19   For the reasons explained above, IT IS RECOMMENDED that the petition for writ of

20   habeas corpus be denied.

21   These findings and recommendations are submitted to the United States District Judge

22   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

23   after being served with these findings and recommendations, any party may file written

24   objections with the court and serve a copy on all parties.  Such a document should be captioned

25   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

26   shall be served and filed within fourteen days after service of the objections.  The parties are

27   ////

28   ////

advised that failure to file objections within the specified time may waive the right to appeal the

District Courts order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 12, 2013

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE